UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

GREAT NECK SAW MANUFACTURERS, INC.,

                            Plaintiff,

vs.

STAR ASIA U.S.A., LLC

                            Defendant.

No. C06-647Z

ORDER

      THIS MATTER comes before the Court on three separate motions for partial summary judgment, one concerning the utility patent in suit, docket no. 114, another involving the design patents at issue, docket no. 112, and the third relating to the trade dress and similar claims in this matter, docket no. 113, as amended, docket no. 115. Having reviewed all papers filed in support of and in opposition to each motion, the Court now enters the following Order.

ORDER - 1

# I.  Background

Plaintiff Great Neck Saw Manufacturers, Inc. ("Great Neck") distributes

various folding knives under the brand name SHEFFIELD, as well as under the

CRAFTSMAN label for Sears Roebuck and Co. and under the HUSKY mark for The

Home Depot.  Great Neck is the assignee of one utility patent and seven design patents

for a folding knife.  Great Neck also has two trademarks on the Supplemental Register,

one consisting of a blade holder and the other consisting of a knife handle.

Defendant Star Asia U.S.A., LLC ("Star Asia") distributes a folding knife under

the trademark TITAN.  In this litigation, Great Neck has alleged that Star Asia's

TITAN product infringes Great Neck's utility patent, as well as each of Great Neck's

seven design patents.  Great Neck also asserts, under federal, New York, and

Washington law, claims for trade dress infringement, false designation of origin, and

unfair competition.  In addition, Great Neck presents claims, under federal and New

York law, for unprivileged imitation and passing off.  Star Asia has moved for

summary judgment as to all claims, dividing the claims into three categories, namely

(i) infringement of the utility patent, (ii) infringement of the design patents, and

(iii) trade dress infringement and other claims.  The Court will use a similar approach.

# II.  Discussion

## A.    Standard for Summary Judgment

The Court should grant summary judgment if no genuine issue of material fact

exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

56(c).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A fact is material if it might affect the outcome of the suit under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In support of its motion for summary judgment, the moving party need not negate the opponent's claim, *Celotex*, 477 U.S. at 323; rather, the moving party will be entitled to judgment if the evidence is not sufficient for a jury to return a verdict in favor of the opponent, *see Anderson*, 477 U.S. at 249.

When a properly supported motion for summary judgment has been presented, the adverse party "may not rely merely on allegations or denials in its own pleading." Fed. R. Civ. P. 56(e)(2).  Rather, the non-moving party must set forth "specific facts" demonstrating the existence of a genuine issue for trial.  *Id.*; *Anderson*, 477 U.S. at 256.  To survive a motion for summary judgment, the adverse party must present "affirmative evidence," which "is to be believed" and from which all "justifiable inferences" are to be favorably drawn.  *Anderson*, 477 U.S. at 255, 257.  When the record, however, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, summary judgment is warranted.  *See Miller v. Glenn Miller Prod., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006); *see also Beard v. Banks*, 548 U.S. 521, 529 (2006) ("Rule 56(c) 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" (quoting <u>Celotex</u>, 477 U.S. at 322)).

**B.     <u>Utility Patent</u>**

The utility patent in suit, U.S. Patent No. 7,040,022 ("the '022 Patent"), contains 31 claims, three of which are independent and 28 of which are dependent. <u>See</u> '022 Patent, Exh. A to Fourth Amended Complaint (docket no. 60) & Exh. 1 to Motion (docket no. 114-2).  Great Neck alleges that Star Asia has infringed Claim 26, which is independent, and Claims 27 to 31, which are dependent upon Claim 26.  <u>See</u> Plaintiff's Statement of Asserted Claims at 2 (docket no. 39); <u>see also</u> Order at 2 (docket no. 106).  The parties have focused on two of the limitations within Claim 26, namely "blade holding means on said blade holder for removably holding a blade on said blade holder" and "blade lock means pivotally mounted on said blade holder." <u>See</u> '022 Patent at Col. 6, Lines 41-42 & 43-44, Exh. 1 to Motion (docket no. 114-2). Star Asia does not concede that the remaining elements of Claim 26 "read on" its accused TITAN device, but rather contends that one or both of the limitations to which it has directed the Court's attention are not satisfied and that, as a result, neither Claim 26 nor any of its dependent claims are infringed.  <u>See</u> <u>Amhil Enters. Ltd. v. Wawa, Inc.</u>, 81 F.3d 1554, 1562 (Fed. Cir. 1996) (literal infringement exists "when every limitation recited in the claim is found in the accused device, i.e., when the properly construed claim reads on the accused device exactly"); <u>see also</u> Minute Order at ¶ 1 (docket no. 103) (ruling that, by not taking a position regarding the construction

of two other claim terms, namely "means for locking and unlocking said blade holder" and "spring means are mounted," Star Asia did not waive any arguments).

Both of the claim terms at issue incorporate the word "means."  Under the Patent Act of 1952, a patentee is permitted to express a claim limitation "as a means . . . for performing a specified function" without including in the claim language the structure that performs the function.  35 U.S.C. § 112, ¶ 6.  In exchange, however, for this ability to make broad, generic claims, a patentee is obligated to "indicate in the specification what structure constitutes the means" for performing the function at issue.  _Biomedino, LLC v. Waters Techns. Corp._, 490 F.3d 946, 948 & n.1 (Fed. Cir. 2007); _see also_ 35 U.S.C. § 112, ¶ 6 ("such [means-plus-function] claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof").  When a patent claim employs the word "means" to describe a limitation, a presumption arises that the inventor intended to invoke § 112, ¶ 6.  _Biomedino_, 490 F.3d at 950.  This presumption may be rebutted if certain conditions are met, but in this case, after conducting a hearing pursuant to _Markman v. Westview Instruments, Inc._, 52 F.3d 967 (Fed. Cir. 1995), the Court held that the means-plus-function standard of § 112, ¶ 6 dictated how the two limitations at issue should be construed.  _See_ Order at 6-9 (docket no. 106).  As a result, in crafting its _Markman_ Order, the Court looked to the structures described in the specification of the '022 Patent, corresponding to the recited functions, to interpret the two disputed claim terms.

The specification contains the following illustration:



FIG.6

'022 Patent, Fig. 6, Exh. 1 to Motion (docket no. 114-2).  Based on the language of the

specification and the above illustration of the preferred embodiment, the Court

construed "a blade holding means" to comprise:

> a thin main wall **34**, a thin guard wall **35** pivotally mounted on the main
> wall, and a pair of spaced protrusions **40** extending from the upper
> portion of the main wall, said blade holding means being on said blade
> holder for removably holding a blade **B** on said blade holder,

and "a blade lock means" to comprise:

> a u-shaped clip having a segmented or interrupted top wall **48**, a pair of
> side walls **49**, and a finger tab extending out from a side wall **50**, said
> blade lock means being pivotally mounted on said blade holder.

<u>See</u> Order at 9 & 10 (docket no. 106) (citing '022 Patent at Col. 2, Lines 54-61; Col. 3,

Lines 1-5; & Fig. 6).

After the Court entered its _Markman_ Order, the parties procured opinions and reports from their respective experts, Howard C. Miskin for Great Neck,[1] and Richard W. Klopp, Ph.D., P.E. for Star Asia, concerning whether Star Asia's TITAN device infringes Claims 26 to 31 of Great Neck's utility patent.  Neither expert, however, applied the correct legal standard.  The standards that govern in the means-plus-function context differ from the usual doctrines of patent infringement.  To prove literal infringement of a means-plus-function limitation, the patent owner must show: (i) the relevant structure in the accused device performs the identical function recited in the patent claim; and (ii) the relevant structure in the accused device is identical or equivalent to the corresponding structure in the specification.  _Odetics, Inc. v. Storage Tech. Corp._, 185 F.3d 1259, 1267 (Fed. Cir. 1999).  Although both parties cited _Odetics_ in their briefs, they did not perform an analysis using the standard set forth in that case.

Applying the two-part test outlined in _Odetics_, the Court concludes that the first prong is satisfied because certain structures of the TITAN device perform the two claimed functions at issue, namely removably holding a standard trapezoidal blade and locking the blade in place.  With regard to the second element of the _Odetics_ standard,

---

[1] In conjunction with its response to the motion for partial summary judgment relating to the utility patent in suit, Great Neck proffered excerpts from Mr. Miskin's report.  _See_ Exh. 1 to McBrayer Decl. (docket no. 122).  Star Asia objected to this practice, _see_ Reply at 7 (docket no. 124), accurately observing that Great Neck's submission does not satisfy the requirements of Federal Rule of Civil Procedure 56(e)(1) because no signature page or attestation by Mr. Miskin was included.  The Court, however, declines to strike the portions of Mr. Miskin's report that were attached to Mr. McBrayer's declaration.

Great Neck has not disputed, and the Court finds, that the TITAN knife does not have structures identical to those disclosed in the specification of the '022 Patent; the TITAN product has neither a pivoting guard wall nor a pivoting u-shaped clip. Thus, the second part of the _Odetics_ inquiry requires only that the Court evaluate structural equivalence, _i.e._, whether the allegedly equivalent components of the accused TITAN device perform the claimed functions in "substantially the same way" to achieve "substantially the same result" as the corresponding structures described in the specification. _Odetics_, 185 F.3d at 1267; _see id._ ("The content of the test for insubstantial differences under § 112, ¶ 6 thus reduces to 'way' and 'result.'"). For purposes of this analysis, a structure may consist of multiple components; the relevant structure is the totality of parts corresponding to the claimed function. _Id._ at 1268. Thus, structures with different numbers of elements may still be equivalent, and the Court must avoid any type of component-by-component comparison.[2] _Id._; _see also_ _Caterpillar Inc. v. Deere & Co._, 224 F.3d 1374, 1380 (Fed. Cir. 2000).

A determination concerning patent infringement generally constitutes a question of fact,[3] and summary judgment of non-infringement may be granted only if, after viewing the alleged facts in the light most favorable to the non-movant, no genuine issue exists concerning whether the accused device or process is encompassed

---

[2] Star Asia's expert, however, improperly engaged in a component-by-component comparison, _see_ Klopp Report at 14-16, Exh. 4 to Motion (docket no. 114-5), and the Court has largely disregarded his opinion.

[3] _But see Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc._, 145 F.3d 1303, 1309 (Fed. Cir. 1998) (observing that whether a determination of equivalents under § 112, ¶ 6 constitutes a question of law or fact remains undecided by the Federal Circuit (citing _Markman_, 52 F.3d at 977 n.8)).

by the patent in suit.  *Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1341 (Fed.

Cir. 2001).  In this case, the Court is persuaded that, contrary to Great Neck's

contention, Mr. Miskin's opinion, as reflected in his report, does not create any

genuine issue of material fact because Mr. Miskin has relied on the general doctrine of

equivalents rather than the applicable standards associated with § 112, ¶ 6.[4]  *See* *Rebel*

*Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1440 (9th Cir. 1995) ("Assertions in expert

affidavits do not automatically create a genuine issue of material fact. . . .  'When the

expert opinion is not supported by sufficient facts to validate it in the eyes of the law

or when indisputable record facts contradict or otherwise render the opinion

unreasonable,' summary judgment is appropriate.").  The Court may therefore grant

summary judgment in this case.  *See* *Grayson v. McGowan*, 543 F.2d 79, 80 (9th Cir.

1976) ("It is long established in this circuit that, when the Rule 56 standards are met

and the court, without aid of expert opinion, can understand the prior art and patent

---

[4] Generally, the doctrine of equivalents constitutes one of two ways of establishing patent infringement; however, when a means-plus-function limitation is involved, the doctrine of equivalents has no relevance unless the accused device employs technology developed after issuance of the patent. *See* *Welker Bearing Co. v. PHD, Inc.*, 550 F.3d 1090, 1100 (Fed. Cir. 2008).  As explained in *Welker*, the second "structural equivalents" prong of the literal infringement test for a means-plus-function limitation is "closely related" to the doctrine of equivalents, but it differs in an important way. *Id.* at 1099.  For purposes of the means-plus-function literal infringement (*Odetics*) analysis, a structure may be considered equivalent only if it was available at the time the patent issued; on the other hand, the doctrine of equivalents may capture technology available only after issuance of the patent. *Id.* at 1099-1100.  When the proposed equivalent in the accused device does not involve after-invented technology, the means-plus-function literal infringement standard and the doctrine of equivalents collapse into a single § 112, ¶ 6 analysis. *Id.* at 1100; *see* *Bateman v. Por-Ta Target, Inc.*, 155 Fed. Appx. 511, 516-17 (Fed. Cir. 2005); *Chiuminatta*, 145 F.3d at 1311 ("where the equivalence issue does not involve later-developed technologies, but rather involve technology that predates the invention itself. . . . , a finding of non-equivalence for § 112, ¶ 6, purposes should preclude a contrary finding under the doctrine of equivalents").  In the case before the Court, Great Neck makes no contention that the elements of the TITAN knife at issue involve technology postdating issuance of the '022 Patent.  Thus, the doctrine of equivalents is not applicable, and the appropriate standards for infringement analysis are those outlined in *Odetics*.

claims, summary judgment is proper."); *see also Intellectual Sci. & Tech., Inc. v. Sony Elecs., Inc.*, 589 F.3d 1179, 1183-84 (Fed. Cir. 2009) (Federal Circuit "considers the sufficiency of an expert's opinion at summary judgment according to the standards of regional circuit law.").

Turning to the structural equivalence analysis required by *Odetics*, as indicated earlier, Star Asia's TITAN knife contains structures associated with the two functions at issue, namely removably holding a standard trapezoidal blade and locking the blade in place. The structure in the TITAN knife that performs the removably holding function consists of two fixed walls, spaced a short distance apart via top and bottom flanges on the rear wall, between which a blade may be inserted and easily withdrawn. The cross-sectional view of this structure can be represented as follows:



rear wall with top and bottom flanges

front wall (affixed to rear wall via rivets)

space into which a blade may be inserted (perpendicular to plane)

The front wall contains a cross-shaped window, through which a portion of the blade may be viewed, as well as a half-cylindrical protrusion along the top edge, both of which can be seen in the following illustration:



Fig. 3 of Klopp Report, Exh. 4 to Motion (docket no. 114-5)

The structure of the TITAN device that performs the blade locking function consists of (a) a pivoting key comprised of a straight stock with two vertical protrusions on one end and, on the other end, a circular projection and triangular ridged finger tab, (b) a set screw, and (c) a spring. The downward protrusions in the key correspond with the two notches **38** in the standard trapezoidal blade **B**. The key is held in place between the two fixed walls of the blade holding structure via a set screw around which the key may pivot. A vertically oriented spring, housed under the finger tab, keeps the key in the horizontal "locked" position; however, when the finger tab is depressed, the key's protrusions are elevated and thereby disengaged from the notches of the blade. This "see-saw" motion of the key locks and unlocks the blade.





_See_ Klopp Report at Figs. 3 & 4, Exh. 4 to Motion (docket no. 114-5) (labels added); _see also_ '022 Patent, Fig. 6, Exh. 1 to Motion (docket no. 114-2) (cropped to isolate blade **B**). For the reasons outlined below, the Court concludes as a matter of law that the structures of the accused TITAN knife do not perform the removably holding and blade locking functions in "substantially the same way" to achieve "substantially the

same result" as the corresponding structures described in the specification of the '022 Patent.  *See* *Odetics*, 185 F.3d at 1267.

### 1.    Removably Holding a Blade

With regard to removably holding a blade, the TITAN device implements a simple sliding technique, while the structure in the specification of the '022 Patent employs a three-part, "open, place or extract, and close" approach.  When the TITAN's blade locking structure is disengaged, a blade may be effortlessly slid into or withdrawn from the space between the two fixed walls of the blade holding structure. In contrast, the structure disclosed by the specification of the '022 Patent requires pivoting of the guard wall to the "open" position, placement of the blade so that the protrusions of the main wall are aligned with the notches in the blade, or extraction of the blade from that same position, and pivoting of the guard wall to the "closed" position.  Thus, the "way" in which the structures of the accused TITAN product and the patented knife accomplish the removably holding function is substantially different.  Moreover, the "results" achieved by the two blade holding structures are not comparable.  Absent the blade locking structure, the TITAN's fixed walls do not inhibit the blade from sliding out, whereas the blade holding structure shown in the specification of the '022 Patent, which incorporates two protrusions matching the top notches of a standard blade, prevents the blade from moving when the guard wall is in the "closed" position.

## 2.     __Blade Locking__

Turning to the blade locking structures, the Court concludes that they likewise lack parity.  In the TITAN product, the blade locking structure uses a one-step "see-saw" motion, unlocking the blade when the finger tab is vertically depressed and locking the blade when the finger tab is released.  In contrast, the blade locking structure described in the specification of the '022 Patent requires a two-part operation, namely vertically pulling the u-shaped clip away from the walls of the blade holding structure and then rotating it into the "open" position, or rotating the clip toward the walls of the blade holding structure and then vertically pushing it into the "closed" or "locked" position.  In addition, although both structures incorporate a pivot point near the top of the blade holding structure and close to the handle of the knife,[5] the blade locking structures possess different axes and degrees of rotation.  The '022 Patent discloses a u-shaped clip that is hinged at one end, about which it rotates approximately 75° from the "open" to the "closed" or "locked" position.  In contrast, the TITAN device contains a key-like stock with an intermediate pivot point that permits at most only 30° of rotation.  Finally, unlike the structure described in the specification, which locks the blade when pressed down, the corresponding structure of the TITAN knife releases the blade when pressed down.

---

[5] Although the specification depicts the pivot point close to the handle of the knife, the embodiment that Great Neck currently markets, a sample of which was provided to the Court, places the hinge on the leading edge of the blade holding structure, away from the handle, so that the u-shaped clip rotates counter-clockwise from the "closed" to the "open" position when viewed from the front of the knife.

 

SPECIFICATION
*See* '022 Patent at Fig. 6
(modified to show degrees of rotation)

TITAN DEVICE
*See* Klopp Report at Fig. 3
(modified to show degrees of rotation)

Not only do the blade locking structures achieve their functions in dissimilar "ways," they accomplish disparate "results." Although both structures, when in the "locked" position, inhibit blade movement, when the structures are in the "open" or "unlocked" orientation, the consequences are vastly different. When the blade locking structure disclosed in the specification is swung into the "open" orientation, the guard wall of the blade holding structure is free to pivot away from the main wall. In contrast, when the blade locking structure of the TITAN knife is depressed into the "unlocked" or "open" position, the walls of the blade holding structure remain fixed in place relative to each other.

### 3.   <u>Conclusion</u>

Because the removably holding and blade locking structures at issue do not perform in "substantially the same way" to achieve "substantially the same result," the Court HOLDS, as a matter of law, that the accused TITAN device does not infringe

Claims 26 to 31 of the '022 Patent.[6]  The Court GRANTS partial summary judgment in favor of Star Asia, and DISMISSES with prejudice Great Neck's First Cause of Action, alleging infringement of the utility patent.  *Compare Chiuminatta*, 145 F.3d at 1309 (reversing summary judgment of literal infringement, concluding that no reasonable jury could find the structures at issue equivalent under a § 112, ¶ 6 analysis, one structure being comprised of soft wheels rotatably mounted to a saw and the other consisting of a hard, predominantly flat "skid" plate).

## C.   Design Patents

Great Neck is the assignee of seven design patents, claiming nine different embodiments.  Seven of these embodiments relate to the ornamental design for an entire utility knife, while two of these embodiments involve only the handle of a utility knife.  The first of these design patents to issue, namely United States Patent No. D495, 939 (the "D'939 Patent"), contains two embodiments:



FIG.1



FIG.10

---

[6] In light of the Court's ruling of non-infringement, the Court declines to address Star Asia's separate arguments that (i) Claim 26 of the '022 Patent is indefinite and therefore invalid, and (ii) Star Asia did not engage in any willful infringement.  In addition, because the doctrine of equivalents does not apply in this case, *see supra* note 4, the Court has not considered Star Asia's contention that Great Neck is barred by the prosecution history associated with the '022 Patent from asserting the doctrine of equivalents.

D'939 Patent, Exh. 6 to Motion (docket no. 112-2).  The handles on these figures

appear substantially similar, but the blade holding means differ in design, with one

employing a segmented u-shaped clip and the other having some type of Phillips-head

screw.  The D'939 Patent issued in September 2004.  Great Neck subsequently

obtained two related patents, one resulting from a continuation-in-part of the

application for the D'939 Patent and the other stemming from a division of the

application for the D'939 Patent.  The two ornamental designs claimed in these patents

are, respectively, as follows:




FIG.1

FIG.2

FIG.7



FIG. 1

FIG. 2

United States Patent No. D501,782            United States Patent No. D510,250
Exh. 18 to Motion (docket no. 112-2)         Exh. 19 to Motion (docket no. 112-2)

One of the distinctions between the above designs and the D'939 Patent

involves the belt clip.  The design on the left (the "D'782 Patent") has a more rounded

or curved belt clip than the D'939 Patent.  In addition, the belt clip in the D'782 Patent

is placed on the reverse side of the handle, instead of on the front, as in the D'939

Patent.  Meanwhile, the design on the right (the "D'250 Patent") contains no belt clip

on either side of the handle.  Moreover, although the D'782 Patent employs a

segmented u-shaped clip, the finger tab is located on the rear portion of the clip, near

the handle, rather than on the leading edge of the clip as in the D'939 Patent.  Finally,

unlike in the D'939 Patent, the D'782 Patent depicts the underside of the blade holding

means as being serrated.

Both the D'782 Patent and the D'250 Patent issued in 2005.  In 2006 and 2007,

respectively, Great Neck obtained two more design patents, one of which contains two

embodiments, and both of which are derived from continuations-in-part of the

application for the D'250 Patent:



United States Patent No. D528,895          United States Patent No. D552,955
*See* Exh. D to Fourth Amended              Exh. 26 to Motion (docket no. 112-3)
Complaint (docket no. 60-2)

ORDER - 17

The above designs differ from the three previously discussed patents (*i.e.*, the D'939, D'782, and D'250 Patents) in one shared respect -- they have handles with squared edges rather than chamfered edges.  In addition, the design on the right (the "D'955 Patent") incorporates a segmented u-shaped clip that has a finger tab protruding from the side, near the front end, but not on the leading edge as in the D'939 Patent.

Also in the 2006 and 2007 timeframe, Great Neck secured two other design patents that are related to each other but independent of the D'939 Patent and its related patents.  These two ornamental designs are comprised of chamfered-edged handles with curved belt clips on the reverse side, as well as flat bars at the top of the blade holding means with either (i) a protruding finger tab, or (ii) a squared edge, which is accessible through a semi-circular opening in the top walls of the blade holding means:





United States Patent No. D526,877
Exh. 29 to Motion (docket no. 112-3)

United States Patent No. D543,822
Exh. 34 to Motion (docket no. 112-3)

Star Asia has moved for summary judgment, asserting that its TITAN product does not infringe any of Great Neck's design patents.  Whether an accused device infringes a design patent normally constitutes a question of fact, but because design patents have limited scope, this issue of liability is often resolved by summary judgment.  *See, e.g.*, *OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396 (Fed. Cir. 1997); *see also* *Wing Shing Prods. Co. v. Sunbeam Prods., Inc.*, 665 F. Supp. 2d 357, 368 (S.D.N.Y. 2009) (observing that, in three recent cases, the respective courts granted summary judgment in favor of the accused infringer).  A design patent, unlike a utility patent, protects only the ornamental design of an article, and does not extend to any functional aspects of the design.  *Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1293-94 (Fed. Cir. 2010); *OddzOn*, 122 F.3d at 1404-05.  Although the Federal Circuit has discouraged district courts from translating a design patent drawing into a detailed verbal description of the patent claim, it has also recognized the role district courts must play in distinguishing between the functional and ornamental elements of a design.  *See* *Richardson*, 597 F.3d at 1293; *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 679-80 (Fed. Cir. 2008) (en banc).  For example, in this case, although the presence of a finger tab, which allows the user to push or pull the attached component, whether it be a u-shaped clip or a flat bar, is functional, the features of a particular finger tab (*e.g.*, size, shape, location) might be ornamental.

In *Egyptian Goddess*, the Federal Circuit clarified that the proper test for infringement of a design patent is whether the ordinary observer, "giving such

attention as a purchaser usually gives" and viewing any differences between the

patented design and the accused product "in the context of the prior art," finds that the

devices bear such resemblance as to deceive the observer, inducing him or her "to

purchase one supposing it to be the other."  543 F.3d at 670 (quoting _Gorham Mfg. Co._

_v. White_, 81 U.S. 511, 528 (1871)); _see id._ at 676 (discussing _Litton Sys., Inc. v._

_Whirlpool Corp._, 728 F.2d 1423 (Fed. Cir. 1984)).  In formulating this standard, the

Federal Circuit recognized that, in some instances, consideration of the prior art will

be unnecessary because the patented design and the accused product are "plainly

dissimilar." _Id._ at 678.  On the other hand, in less obvious cases, examination of the

prior art might reveal differences between the designs at issue that are unnoticeable "in

the abstract," but significant in the context of the prior art.  _Id._  Thus, the _Egyptian_

_Goddess_ decision requires a two-tiered approach to infringement analysis, with the

threshold inquiry being whether, without review of the prior art, the claimed and

accused designs are sufficiently similar and, if so, the next level entailing a

comparison to the prior art.[7]  _See id._; _see also Wing Shing_, 665 F. Supp. 2d at 362.  In

both stages, the appropriate method involves a side-by-side study of the designs.

_Crocs, Inc. v. Int'l Trade Comm'n_, 598 F.3d 1294, 1304 (Fed. Cir. 2010); _see Wing_

_Shing_, 665 F. Supp. 2d at 362-69.

---

[7] If an accused infringer relies on a comparison with prior art as part of its defense, it bears the burden of producing such prior art.  _Egyptian Goddess_, 543 F.3d at 678.  The patentee, however, continues to have the burden of proving infringement by a preponderance of the evidence. _Id._ at 678-79.

In this litigation, Great Neck has asserted infringement of nine designs (claimed in seven patents), which are shown below, side-by-side:



| D'939 Patent | D'782 Patent | D'250 Patent | D'895 Patent | D'955 Patent | D'877 Patent | D'822 Patent |

All of these patented designs incorporate a handle with a scalloped lower edge comprised of two inwardly curved (concave) segments and one outwardly curved (convex) portion.  In addition, all of the designs share an elliptical opening or window through at least the front wall of the blade holding means; some of the designs have a similar hole in the rear wall.  Finally, with one exception, in all of the patents claiming a belt clip design,[8] the belt clip is on the reverse side of the handle; only the D'939 Patent locates the belt clip on the front of the handle.

With these common features in mind, the Court turns to the threshold comparison of the claimed designs with the accused device.  The Court concludes that the TITAN product is sufficiently distinct from at least four of the designs, namely those involving a segmented u-shaped clip, to render unnecessary, as to those designs, any examination of prior art.  As seen in the following figures, the handle of the

---

[8] The D'250 Patent contains no belt clip, and the D'955 Patent depicts the belt clip in broken lines, thereby disclaiming the design associated therewith.  *See* D'955 Patent, Exh. 26 to Motion (docket no. 112-3 at 7) ("The broken line portions of the disclosure are included for the purpose of illustrating environmental structure that form no part of the claimed design."); *see also* 37 C.F.R. § 1.152.

TITAN knife is more tightly scalloped, having three concave sections and two convex

portions, the blade holding means of the TITAN product has a cross-shaped opening

rather than an elliptical window, and the TITAN device lacks any element resembling

a segmented u-shaped clip.



D'782 Patent



D'895 Patent
Second Embodiment



Accused Device
Exh. 1 to Motion (docket no. 112-2)



D'939 Patent
First Embodiment



D'955 Patent

The disparity between these four claimed designs and the accused product is

even more pronounced with respect to the D'782 Patent, in which the blade holding

means has a serrated underside, and the first embodiment of the D'939 Patent, in

which the belt clip is located on the front of the handle, in contrast to the TITAN

product and all of Great Neck's other designs.  The Court is persuaded that the

ordinary observer would attach importance to these differences, in part because of

their relationship to utilitarian considerations like ease of use and comfort, but

primarily because the "overall effect" of these features, particularly the segmented

u-shaped clip, indicates distinct approaches to, and therefore different origins of, the

designs.  *See Crocs*, 598 F.3d at 1306 (examining the "overall effects" of the claimed

design).  The Court therefore HOLDS that Great Neck cannot sustain its burden of

proving that the TITAN device would appear to the ordinary observer to be "substantially the same" as the embodiments depicted here, namely the D'782 Patent, the second embodiment of the D'895 Patent, the first embodiment of the D'939 Patent, and the D'955 Patent.  *See Egyptian Goddess*, 543 F.3d at 678.

With regard to Great Neck's remaining designs, the Court concludes that consideration of the prior art is required.  When a field is crowded with many designs for the same type of appliance, the Court must construe the range of equivalents very narrowly.  *Egyptian Goddess*, 543 F.3d at 676 (quoting *Litton*, 728 F.2d at 1444).  Moreover, when a claimed design is close to the prior art, the Court may view small differences between the claimed design and the accused device as being important to the eye of the hypothetical ordinary observer.  *Id.*

The Court begins the second-tier of the infringement analysis with a comparison of the TITAN device's handle, Great Neck's two handle-only designs, and the relevant prior art submitted by Star Asia:

    

Accused Device   D'250 Patent   D'895 Patent First Embodiment   Locking Blade Pocket-Knife U.S. Patent No. 4,837,932 Assignee: Victorinox AG Exh. 9 (docket no. 112-2)   Pocketknife With Integral Ring Fastener (Konneker) U.S. Patent No. 4,570,341 Exh. 8 (docket no. 112-2)

Although Star Asia proffered other prior art, the two pocket-knife handles shown here are closest to the claimed designs.  Indeed, the Victorinox design (second from the right) is almost identical to the claimed designs, having a fairly straight profile on the top of the handle and similar scallops (*i.e.*, one convex and two concave portions) at

the bottom.  The handle of the Konneker pocket-knife (far right) also has scallops, but it has a greater number of convex and concave segments than the handles claimed in the D'250 and D'895 Patents, thereby illustrating the range of design possibilities, with the TITAN device falling somewhere between the two patents in suit and the Konneker design.  Thus, the Court HOLDS that an ordinary observer, having such prior art[9] as a "frame of reference," would readily distinguish between the handle of the TITAN product and the claimed designs at issue, namely the D'250 Patent and the first embodiment of the D'895 Patent.  *See Wing Shing*, 665 F. Supp. 2d at 367 (quoting *Egyptian Goddess*, 543 F.3d at 677).

Likewise, with regard to the three remaining claimed designs, a side-by-side comparison with the relevant prior art reveals that minor differences between the claimed designs and the accused device are significant.  The closest prior art cited by Star Asia consists of a utility patent issued in 2002 to Robert E. Scarla, United States Patent No. 6,354,007 (the "Scarla Patent").  The Scarla Patent discloses a folding knife that holds the same standard trapezoidal blade used in Great Neck's claimed designs and in the accused TITAN device.  As in Great Neck's designs, as well as the TITAN product, the Scarla knife has a blade holding means (described in the Scarla Patent as the "neck"), the walls of which have windows.  In the Scarla design, these windows

---

[9] Although the Victorinox and Konneker designs are contained within utility patents, they still constitute prior art with respect to the design patents at issue.  *See In re Aslanian*, 590 F.2d 911, 913 (C.C.P.A. 1979) ("Although there are different statutory bases and standards for utility patents and design patents, no similar distinction exists when determining what constitutes relevant prior art for these two types of patents.").  Indeed, the Konneker Patent is cited in both the D'250 Patent and the D'895 Patent.

are elongated pill-shaped slots.  The Scarla specification indicates that these slots **14** & **30** have a utilitarian purpose, namely providing access to the blade so that friction contact may be used "to assist in removing blade **12** from neck **11** in the direction of arrow Z."  Scarla Patent at Col. 3, Lines 42-45, Exh. 17 to Motion (docket no. 112-2).



*Id.* at Figs. 1 & 5.  Given their functional nature, the existence of such openings in the walls of the blade holding means is not itself protected by Great Neck's design patents. Moreover, the elongation of such windows in the direction of blade travel, being for a primarily utilitarian purpose, constitutes a design feature having minimal scope. Shape variations perpendicular to the direction of blade travel, however, appear to be purely ornamental, and the TITAN device, with its cross-shaped window, differs significantly from the claimed designs in this respect.



D'939 Patent, Second Embodiment
(example of Great Neck's window design)                Accused TITAN Device

The other design element as to which the Scarla Patent has relevance is the blade lock means.  The Scarla design employs a bolt, which is passed through one of the two notches in the trapezoidal blade when that notch is in registration with the circular openings **15** & **31** in the front and rear walls, respectively, of the blade holding means.  *Id.* at Col. 3, Lines 48-51.  The bolt is fastened in place with a nut **18**, which is visible on the reverse side of the knife.  *See id.* at Fig. 5.  This bolt/nut mechanism serves to "removably fixedly secure blade **12** in aperture **38** and, consequently, in neck **11**."  *Id.* at Col. 3, Lines 49-51.

One of Great Neck's designs, namely the second embodiment of the D'939 Patent, likewise incorporates a bolt or set screw, visible on the front of the knife.  This bolt or set screw has the appearance of a standard Phillips-head part, and it is located in approximately the same position as the fastener in the Scarla design.  As indicated in Great Neck's utility patent, the '022 Patent, which



D'939 Patent
Second Embodiment

depicts this design as one of two embodiments, the set screw or "threaded member" extends through an opening in the guard wall to the main wall, and it serves to hold the guard wall and the blade in place.  *See* '022 Patent at Col. 4, Lines 1-11.  Given its functional nature and standard appearance, this blade lock means is not entitled to design protection, and it cannot be the basis for precluding the presence of a set screw on the face of the TITAN device.

In contrast to these types of bolt/nut or set screw fasteners, the blade lock means on Great Neck's other two remaining designs, namely the D'877 Patent and the D'822 Patent, is comprised of a flat bar that seats between the front and rear walls of the blade holding means and on top of the trapezoidal blade.  The drawings in the D'877 Patent and D'822 Patent do not provide much detail about the design of this bar, for example, its relative height or depth or the contour of its lower edge (_i.e._, where the bar meets the top of the blade).  The drawings, however, do indicate that, in the D'877 Patent, the bar is hinged near the leading edge of the knife and, on the opposite end, the bar contains a protruding finger tab that is rectangular in shape.  The bar in the D'822 Patent, however, has no finger tab, but may be accessed via a semi-circular opening in the front and rear walls of the blade holding means.  Whether the bar in the D'822 Patent is hinged in the middle or friction fit remains unclear.



Accused Device          D'877 Patent          D'822 Patent

Both of these claimed designs differ from the blade lock means of the accused TITAN knife.  Although the TITAN device, like the D'877 Patent, has a bar or key with a finger tab, the tab is triangular rather than rectangular in profile and has a ridged rather than a smooth upper surface, and the hinge for the bar or key is located near the

finger tab rather than on the opposite end.  Moreover, to the extent the D'822 Patent

claims a hinge, although the locations of the hinges are similar, the bars themselves are

distinct because, unlike in the TITAN product, in the claimed design, no protruding

wedge-shaped finger tab exists.

In light of the prior art, which highlights the significance of dissimilarities in

the handles and the windows of the blade holding means, and given the disparities in

the blade lock means, particularly the features of the finger tabs and relative locations

of the hinges, the Court HOLDS that an ordinary observer would readily distinguish

between the claimed designs and the accused device, and that Great Neck cannot, as a

matter of law, establish that the "details of ornament" are "so much alike that in the

market and with purchasers they would pass for the same thing."  _See_ _Egyptian_

_Goddess_, 543 F.3d at 670 (quoting _Gorham_, 81 U.S. at 531).

This ruling is consistent with the analysis of the Primary Examiner for the

D'877 and D'822 Patents.  In the application for the D'877 Patent, 36 drawings were

included; Figures 1-9 related to the design eventually claimed in the D'877 Patent,

while Figures 19-27 were diagrams of the design subsequently claimed in the D'822

Patent.  _See_ Application No. 29/210,497, Exh. 30 to Motion (docket no. 112-3).  The

Primary Examiner required the applicant to elect between the two embodiments (in

other words, choose Figures 1-9 or Figures 19-27), indicating that the differences "in

the appearance of the blade holder mechanisms create patentably distinct designs," that

"may not be included in the same design application."  Office Action at 2, Exh. 31 to

Motion (docket no. 112-3).  The Primary Examiner further reasoned that because the "appearance of the handle is shown to be conventional" by prior art, the distinguishing features of the blade holder mechanisms "have heightened significance."  *Id.* at 2-3. Great Neck elected to proceed with Figures 1-9 in prosecuting the D'877 Patent, and filed a separate application as to Figures 19-27, which gave rise to the D'822 Patent. *See* Exh. 32 to Motion (docket no. 112-3).  The Primary Examiner's conclusion that the claimed designs are sufficiently dissimilar to each other to warrant separate patents supports the Court's view that the subtle but greater differences between the claimed designs and the accused device require a judgment of non-infringement.

In response to Star Asia's motion relating to the various design patents, Great Neck submitted a brief containing minimal analysis, instead relying almost entirely on cross-referenced excerpts from the report of its expert.  *See* Response (docket no. 119); McBrayer Decl. (docket no. 120).  Star Asia requested that these portions from Mr. Miskin's report be excluded because they were presented in an improper form. Reply at 3 (docket no. 123).  Although the submissions do not comport with Federal Rule of Civil Procedure 56(e)(1), the Court declines to strike them.  The Court notes, however, that the proffered segments of Mr. Miskin's report nowhere discuss the first embodiment of the D'939 Patent, and the Court will treat Great Neck's failure to respond as an admission that Star Asia's motion concerning that particular design has merit.  *See* Local Rule CR 7(b)(2).  The Court also observes that Mr. Miskin's report

contains lengthy discussions of the novelty analysis that was explicitly rejected by the

Federal Circuit in *Egyptian Goddess*, and the Court has disregarded those sections.

Finally, the Court is persuaded that, contrary to Great Neck's contention,

Mr. Miskin's report does not raise any genuine issue of material fact that would

preclude summary judgment. In formulating his opinion, Mr. Miskin identified at

least six, and sometimes as many as ten, similarities between a particular claimed

design and the accused TITAN device. He did not, however, enumerate with an

equivalent level of specificity the differences between the claimed designs and the

TITAN product, and he did not examine, in the context of the prior art, whether those

differences would be important to the eye of the hypothetical ordinary observer.

Instead, he repeatedly stated in conclusory fashion that a consumer, familiar with

Great Neck's claimed design, as opposed to the prior art, would not distinguish

between a particular feature of the claimed design (for example, the number of notches

or scallops in the handle) and a comparable but dissimilar element of the accused

TITAN knife (for example, a larger number of notches or scallops in the handle). *See*

Miskin Report at 29, 38, 45, 50-51, 66, 71-72, Exh. 1 to McBrayer Decl. (docket

no. 120-2). Mr. Miskin's analysis inappropriately focused on individual components,

rather than the "overall effect," of the design, *see Crocs*, 598 F.3d at 1306, and

essentially ignored the lessons of *Egyptian Goddess*, which requires that differences

between the claimed and accused designs be viewed through the lens of an observer

"who is conversant with the prior art," and not just the claimed and accused designs. _See_ 543 F.3d at 678.

Moreover, in his report, with respect to each claimed design, Mr. Miskin selected a particular prior art design and opined that the TITAN device and the claimed design are more similar to each other than they are to the prior art.  This analysis is inconsistent with the teachings of the Federal Circuit and entirely unhelpful. For example, in analyzing the D'250 Patent, which claims a design for only the handle of a utility knife, Mr. Miskin chose as his only prior art reference the Scarla Patent, which he denominated as the '007 Patent; in doing so, Mr. Miskin ignored the other, closer prior art references for handles that were discussed in Star Asia's motion and earlier in this Order.  For purposes of the D'877 and D'822 Patents, Mr. Miskin identified only Great Neck's own D'782 Patent as prior art, and he then concluded that the TITAN knife and the designs in the D'877 and D'822 Patents are closer to each other than they are to the design in the D'782 Patent, which incorporates a segmented u-shaped clip.  Although the Court agrees that the segmented u-shaped clip is a significant distinguishing feature, the Court rejects Great Neck's implicit contention that, because the accused device and a particular claimed design are both distinct from a single prior art reference, infringement of the claimed design has been demonstrated.

For the foregoing reasons, the Court GRANTS Star Asia's motion for partial summary judgment, and DISMISSES with prejudice Great Neck's Second, Third,

Fourth, Fifth, Sixth, Fifteenth, and Sixteenth Causes of Action, alleging infringement of the respective design patents.

**D.      Trade Dress and Related Claims**

Great Neck asserts various claims under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), namely trade dress infringement, false designation of origin, unfair competition, unprivileged imitation, and passing off.  Great Neck makes similar claims under New York and Washington law.  Great Neck, however, has not indicated the extent to which New York or Washington law differs, if at all, from federal law.  The Court therefore analyzes these claims solely under federal law.

Section 43(a) of the Lanham Act provides in relevant part:

(1)  Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--

    (A)  is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

    (B)  in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).  To recover under the Lanham Act for infringement of trade dress, a plaintiff must prove (i) the trade dress features at issue are nonfunctional;

ORDER - 32

(ii) the trade dress is inherently distinctive or has acquired distinctiveness through

secondary meaning; and (iii) consumers are likely to confuse the plaintiff's product

with the defendant's accused device.  *See* *Disc Golf Ass'n, Inc. v. Champion Discs,*

*Inc.*, 158 F.3d 1002, 1005 (9th Cir. 1998); *see also* 15 U.S.C. § 1125(a)(3) (with

respect to "trade dress not registered on the principal register, the person who asserts

trade dress protection has the burden of proving that the matter sought to be protected

is not functional.").  In moving for summary judgment, Star Asia contends that Great

Neck cannot establish any of these elements.

### 1.      **Functionality**

With respect to trade dress protection, the requirement of functionality

recognizes that "[i]t is the province of patent law, not trademark law, to encourage

invention by granting inventors a monopoly over new product designs or functions for

a limited time."  *Disc Golf*, 158 F.3d at 1006 (quoting *Qualitex Co. v. Jacobson Prods.*

*Co.*, 514 U.S. 159, 164 (1995)).  To grant trade dress status, which may continue in

perpetuity, to product features that are functional in nature would thwart the public's

ability to practice patented inventions after the patents have expired and thereby

undermine a fundamental principle of patent law.  *See* *Alan Wood Steel Co. v. Watson*,

150 F. Supp. 861, 862 (D.D.C. 1957); *see also* *Vornado Air Circulation Sys., Inc. v.*

*Duracraft Corp.*, 58 F.3d 1498, 1508 (10th Cir. 1995), *abrogated on other grounds by*

*Midwest Indus., Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356 (Fed. Cir. 1999).  A

design may be functional in two ways:  (i) de facto functional, meaning that the

product at issue has a function (a bottle of any design holds a substance); and (ii) de

jure functional, meaning that the product at issue has a particular shape or

configuration because it works better that way.  *Leatherman Tool Group, Inc. v.*

*Cooper Indus., Inc.*, 199 F.3d 1009, 1012 (9th Cir. 1999) (quoting *Textron, Inc. v. Int'l*

*Trade Comm'n*, 753 F.2d 1019, 1025 (Fed. Cir. 1985)).  Designs that are de jure

functional are not entitled to trade dress protection.  *Id.*

In evaluating whether trade dress is de jure functional, the Court must consider

the following four factors:  (i) the existence of an existing or expired utility patent or

other evidence indicating that the design yields a utilitarian advantage; (ii) the

availability of alternative designs; (iii) the extent of advertising touting the utilitarian

aspects of the design; and (iv) the comparative ease and expense associated with

manufacturing the design.  *Clamp Mfg. Co. v. Enco Mfg. Co.*, 870 F.2d 512, 516 (9th

Cir. 1989); *see also* *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1260 (9th

Cir. 2001).  In conducting this analysis, the Court must examine the trade dress as a

whole, rather than parsing the constituent parts, bearing in mind that "[t]rade dress is

the composite tapestry of visual effects."  *Clicks*, 251 F.3d at 1259.  Although

functional elements might separately be unprotectable, they might in the aggregate

convey a visual impression rising to the level of trade dress.  *Id.*  The fundamental

inquiry is whether the design features at issue constitute "the actual benefit that the

consumer wishes to purchase," rather than "an assurance that a particular entity made,

sponsored, or endorsed" the product.  *Leatherman*, 199 F.3d at 1012 (quoting *Vuitton Et Fils S.A. v. J. Young Enters., Inc.*, 644 F.2d 769, 774 (9th Cir. 1981)).

In this case, Great Neck has asserted that its trade dress consists of eleven features, namely the shape, appearance, and location of (a) the blade holder, (b) the upper curve of the handle, (c) the bottom curve of the handle, (d) the upper notch in the handle, (e) the top rivets and pivot pins on the side wall of the handle, (f) the large pivot on the side wall of the handle, (g) the curved front and rear ends of the handle, (h) the handle as viewed from the rear, (i) the handle as viewed from the top, and (j) the handle as viewed from the bottom, as well as (k) the shape, appearance and relative thickness of the layers in the handle as viewed from the top and bottom.[10]  *See* Fourth Amended Complaint at ¶ 49 (docket no. 60).  These components are highlighted in the following illustrations:



---

[10] In its response to Star Asia's motion, Great Neck argues in a cursory fashion that its trade dress is comprised of the aggregate of these eleven features.  Great Neck, however, did not plead the "knife as a whole" in its Fourth Amended Complaint.  *Compare* Response at § IV.A.12 (docket no. 117 at 16) *with* Fourth Amended Complaint at ¶¶ 48-61 (docket no. 60).  Moreover, to the extent that the eleven features are functional, the "knife as a whole" is not entitled to trade dress protection.  *Leatherman*, 199 F.3d at 1013 ("where the whole is nothing other than the assemblage of functional parts, . . . it is semantic trickery to say that there is still some sort of separate 'overall appearance' which is non-functional").



Figs. 1, 20, & 22 to Klopp Report, Exh. 1 to Motion (docket no. 113-2) (labels added).

As evidenced by the specification in Great Neck's existing utility patent, the '022

Patent, most, if not all, of these features are functional in nature.  In the '022 Patent,

the blade holder (a) is described in detail as having a main wall, a pivoting guard wall,

and a pivoting segmented u-shaped clip.  '022 Patent at Col. 2, Lines 41-67 & Col. 3,

Lines 1-15, Exh. 3 to Motion (docket no. 113-2).  These elements serve the purpose of

securing the blade, while also allowing for relatively easy replacement of the blade.

*See* *id.* at Col. 1, Lines 14-16 & 27-29 & Col. 3, Lines 12-15 & 51-60.

Likewise, the upper notch (d), pivot pin (e$_1$), and large pivot (f) are necessary

components of the two-arm lever assembly that enables the blade holder to fold into

the handle of the knife.  *See* *id.* at Col. 2, Lines 23-40 & Col. 3, Lines 26-50.  To fold

the knife, the user must press down on the rear arm, through the notch (d), which will

cause the rear arm to pivot about the top pin (e$_1$) and disengage from the front arm,

permitting the blade holder (a) to rotate at the large pivot (f) and swing into the handle.

*Id.*  To accept the blade holder, the underside of the handle must have an opening with

sufficient clearance, giving rise to the inverted "U" appearance from the rear of the

handle (h) and the slotted look underneath the handle (j).  The top view of the handle (i) is dictated by the configuration of the rear lever arm sandwiched within the walls of the handle, which are held together by fasteners (e) that are passed through spacers, *id.* at Col. 2, Lines 12-15, and the thicknesses of the layers (k) lend strength to the components without rendering them overly bulky.  Finally, the scalloping at the bottom of the handle (c), described as "undulated" in the '022 Patent, permits a "user's fingers to grip the handle."  *Id.* at Col. 2, Lines 17-19.

Returning to the four-factor test for functionality, the Court concludes that, under the first factor, Great Neck's utility patent constitutes "strong evidence" of functionality.  *See* *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29-30 (2001); *see also* *Disc Golf*, 158 F.3d at 1008 ("one cannot argue that a shape is functionally advantageous in order to obtain a utility patent and later assert that the same shape is non-functional in order to obtain trademark protection" (quoting J.T. McCarthy, *McCarthy on Trademarks and Unfair Competition* § 7:89 at 7-208 (4th ed. 1998))).  With regard to the second factor, namely the availability of other designs, the parties have not developed much of a record.  Counsel for Great Neck suggests that certain excerpts from Mr. Miskin's report relate to "design alternatives for certain features of Star Asia's knives."  McBrayer Decl. at ¶ 8 (docket no. 118).  The portions provided, however, do nothing more than opine that the TITAN device infringes Great Neck's various design patents, Exh. 7 to McBrayer Decl. (docket no. 118-8), which does not demonstrate meaningfully "available" alternatives.

Evidence relating to the third factor, however, has been presented to the Court, and it weighs in favor of functionality. The record reflects that Great Neck touts the folding, "lockback," and "quick change" characteristics of the SHEFFIELD device in its promotional materials, copies of which were submitted to the Commissioner for Trademarks in response to the examiner's refusal to register the trade dress at issue on the Principal Register after deeming the proposed mark functional.[11]  _See_ Exh. 4 to Motion (docket nos. 113-10 at 18-25 & 113-11 at 1-5); _see also_ Notice of Abandonment, Exh. 4 to Motion (docket no. 113-3 at 2-4).



Exh. 4 to Motion,
docket no. 113-11 at 2

As to the fourth factor, Star Asia's expert opines that some of the forms and shapes at issue are comparatively easier and therefore less costly to manufacture. For example, with reference to notch (d), Dr. Klopp indicates that a circular shape is easier to create than a form with sharp corners or compound curves; a sharp notch requires

---

[11] Prior to its attempt to register on the Principal Register, Great Neck had obtained two registrations on the Supplemental Register, one for the blade holder and one for the handle of its knife. _See_ Exhs. 3 & 4 to McBrayer Decl. (docket nos. 118-4 & 118-5). Great Neck contends that these registrations evidence non-functionality, quoting the statutory provision concerning eligibility for the Supplemental Register, which permits registration of "any matter that as a whole is not functional." 15 U.S.C. § 1091(c). Great Neck, however, ignores the subsequent determination of functionality, which the Deputy Commissioner for Trademark Examination Policy indicated was "an absolute bar to registration [of Great Neck's design] either on the Principal Register or the Supplemental Register." Exh. 4 to Motion (docket no. 113-3 at 4). In addition, Great Neck cites no authority for the proposition that the Supplemental Register carries the same clout as the Principal Register. In fact, the opposite is true. Although registration on the Principal Register operates as prima facie evidence of _inter alia_ the validity of the mark, _see_ 15 U.S.C. § 1057(b), registration on the Supplemental Register "is not prima facie evidence of anything except that the registration issued." _Copperweld Corp. v. Arcair Co._, 200 U.S.P.Q. 470, 474 (TTAB 1978). Finally, even if Great Neck's registrations constituted some evidence of protectable trade dress, the marks depicted in the certificates do not have the same scope as the trade dress claimed in this litigation.

tools with sharp edges that tend to wear faster than rounded tools, and compound curves require more sophisticated tools or machine programming.  Klopp Report at 33, Exh. 1 to Motion (docket no. 113-2 at 35).  Likewise, Dr. Klopp reports that the cylindrical form of pins, rivets, screws, and pivots, and the round nature of the holes that accommodate them, are dictated by standard production methods, including the use of turning equipment and rotary tooling.  *Id.* at 34-35.  Finally, Dr. Klopp references the functional and manufacturing considerations that determine the thickness and rectilinear shape of the main components of the handle and knife.  The parts must be thick enough to maintain structural integrity, while thin enough for the device to remain compact and comfortable to use, as well as economical to produce, and their fabrication from sheets of uniform thickness renders a rectilinear shape the most cost effective.  *Id.* at 33-34, 35-37.

Great Neck's expert, Howard Miskin, does not directly dispute the manufacturing rationales articulated by Dr. Klopp.[12]  Indeed, in discussing notch (d), Mr. Miskin states that the feature could have been "a rectangle with rounded corners," but fails to address the difficulty and expense associated with such design.  Miskin Rebuttal Report at 13, Exh. 1 to McBrayer Decl. (docket no. 118-2 at 16).  With regard to the pins and rivets (e) and large pivot (f), Mr. Miskin opines that the sizes and appearances could vary from Great Neck's design, but he does not suggest that the measurements involved are anything other than standard dimensions, perhaps tracking

---

[12] In response to Star Asia's motion, Great Neck submitted both excerpts of Mr. Miskin's initial report and a full, unsigned copy of his rebuttal report.  Star Asia has objected to these filings in light of their deficient form.  Reply at 6 (docket no. 125).  The Court, however, declines to strike them.

round stock diameters or rotary tooling sizes, and he provides no analysis regarding the relative costs of using smaller or larger, standard or custom parts.  *Id.* at 14-15. Finally, while not disagreeing with Dr. Klopp's statement that the rectilinear components of the knife are fabricated from uniform-thickness sheets, Mr. Miskin accuses Dr. Klopp of ignoring the alternatives, and he makes reference to other unidentified utility knives on the market with different overall thicknesses.  *Id.* at 14. Mr. Miskin, however, does not examine the tradeoffs between structural integrity, compactness, and expense in choosing a particular thickness of starting material.  In light of Great Neck's failure to rebut Star Asia's evidence concerning the manufacturing purposes underlying the forms of certain components, the Court concludes that the fourth factor weighs in favor of functionality.

Because Great Neck has an existing utility patent for the device at issue, Great Neck bears a "heavy burden" of establishing that the elements of its alleged trade dress are merely "ornamental, incidental, or arbitrary."  *TrafFix*, 532 U.S. at 30.  The Court HOLDS that, as a matter of law, Great Neck has not met and cannot carry this burden. The features of Great Neck's utility knife that it asserts constitute trade dress, when viewed as a whole, simply offer "the actual benefit that the consumer wishes to purchase," namely a folding knife with an easily replaceable blade.  *See Leatherman*, 199 F.3d at 1012; *see also Versa Prods. Co. v. Bifold Co.(Mfg.) Ltd.*, 50 F.3d 189, 207 (3d Cir. 1995) ("Where product configurations are concerned, we must be especially wary of undermining competition.  Competitors have broad rights to copy successful

product designs when those designs are not protected by (utility or design) patents.  It is not unfair competition for someone to trade off the good will of a product; it is only unfair to deceive consumers as to the origin of one's goods and thereby trade off the good will of a prior producer." (citations omitted)).  Under the four-factor test outlined in *Clamp Mfg.*, Great Neck's trade dress is de jure functional and therefore not entitled to trade dress protection.

### 2. **Distinctiveness**

Great Neck makes no contention that its alleged trade dress is inherently distinctive; rather, it asserts that the unregistered mark has acquired distinctiveness through secondary meaning.  Star Asia counters that Great Neck has allowed its device to be marketed and sold by other entities under those entities' respective private labels, thereby negating any secondary meaning associated with the product design.  Star Asia presents evidence that Great Neck's utility knife is distributed by Sears Roebuck and Co. under the CRAFTSMAN label, as well as by The Home Depot under its HUSKY brand.  *See* Tsitsis Decl. at ¶¶ 3 & 4 and at Exhs. A & B, Exh. 5 to Motion (docket no. 113-15).

Great Neck does not dispute that it has engaged in the practice of private labeling, but instead argues that the "large majority" of its products are sold under the SHEFFIELD mark.  *See* Response at 14 (docket no. 117).  In support of this assertion, Great Neck offers a spreadsheet for the years 2004 through 2008, which indicates that 6,411,416 knives of one kind or another were sold.  *See* Exh. 6 to McBrayer Decl.

(docket no. 118-7).  The chart, however, does not provide any information about the labels under which these knives were sold, nor does it compare the number of knives distributed under the SHEFFIELD mark against the amount sold as CRAFTSMAN or HUSKY devices.  Moreover, the sales data was merely appended to the declaration of Great Neck's attorney, who presumably has no personal knowledge and would not be competent to testify about these matters.  *See* Fed. R. Civ. P. 56(e)(1).  Thus, Great Neck has not established that privately labeled products represent an insubstantial portion of its business.

In light of the evidence Star Asia has proffered, showing that two entities, which operate in the relevant market and distribute products nationwide, sell utility knives with the exact configuration at issue under brands other than SHEFFIELD, the Court HOLDS that Great Neck has not established the requisite distinctiveness to pursue its claims under the Lanham Act.  *See* *Versa Prods.*, 50 F.3d at 216 ("The use of private labeling undermines a claim that a product's appearance denotes its source because consumers will be less likely to associate the multifariously labeled product with a *single* source." (emphasis in original)); *see also* *Aerogroup Int'l, Inc. v. Marlboro Footworks, Ltd.*, 1996 WL 929597 at *13 & *16 (S.D.N.Y.) ("[W]hen the owner of a trademark or trade dress engages in private labeling, it puts its product on the market with another company's label on it.  When consumers see that product in the marketplace as well as the company's own product – with different labels – they are more likely to infer that there is more than one source supplying that product. . . .

Aerogroup's practice of allowing several private label brands – including Eddie Bauer, Bass, Canyon River, and Trader Bay – to explicitly label the waffle sole as theirs is strong evidence that Aerogroup itself does not believe that consumers identify the waffle sole with a single source or with Aerogroup. . . .  [T]he waffle sole is not entitled to trademark protection.").  This lack of distinctiveness constitutes a separate and independent ground for granting partial summary judgment in favor of Star Asia and dismissing Great Neck's trade dress and related claims.

### 3.   **Consumer Confusion**

Star Asia contends that Great Neck cannot establish the requisite consumer confusion to prevail on its trade dress infringement claim.  The Court agrees.  Indeed, in opposing Star Asia's motion, Great Neck offers no admissible evidence concerning a number of the so-called *Sleekcraft* factors.  *See* *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979) (enumerating eight factors relevant to whether confusion between related goods is likely).  For example, Great Neck has provided no declaration or testimony concerning the proximity of the goods at issue or describing their marketing channels.  Moreover, in response to Star Asia's assertion that no instance of actual confusion has been brought to its attention, *see* Hansford Decl. at ¶ 12, Exh. 6 to Motion (docket no. 113-15), Great Neck has presented no evidence, even by way of expert opinion or market survey, regarding either actual or likely consumer confusion.  Finally, Great Neck has not engaged in any analysis about the inherent strength of its mark or the degree of care generally exercised by purchasers of

its or its competitors' utility knives.  Great Neck's extraordinarily weak response to

this portion of Star Asia's motion does not justify its assertion that genuine issues of

material fact exist; Great Neck simply has not identified what, if anything, remains for

trial.  Thus, the Court is persuaded that Star Asia is entitled to partial summary

judgment on the alternative ground that Great Neck has not satisfied its burden to

"make a showing sufficient to establish the existence of an element essential to [its]

case," _Beard_, 548 U.S. at 529, namely the likelihood of consumer confusion.

### 4.   Conclusion

Because Great Neck's trade dress is de jure functional, the Court GRANTS Star

Asia's motion for partial summary judgment and DISMISSES with prejudice Great

Neck's Seventh, Eighth, Ninth, Tenth, Eleventh, Twelfth, Thirteenth, and Fourteenth

Causes of Action, on the ground that the alleged trade dress is functional and therefore

not entitled to protection under the Lanham Act or similar state laws.[13]  The Court also

GRANTS Star Asia's motion for partial summary judgment on the alternative grounds

---

[13] Star Asia contends, and Great Neck does not dispute, that a conclusion of functionality as to Great Neck's alleged trade dress also defeats Great Neck's other Lanham Act claims for false designation of origin, unfair competition, unprivileged imitation, and passing off.  The Court agrees.  The Lanham Act offers federal protection against two types of unfair competition:  infringement of registered trademarks, 15 U.S.C. § 1114, and false designation of the origin of goods, 15 U.S.C. § 1125(a). _Int'l Order of Job's Daughters v. Lindeburg & Co._, 633 F.2d 912, 915 (9th Cir. 1980).  The latter tort, which is alleged in this case, may be asserted in a variety of ways, for example, infringement of an unregistered mark (consisting in this instance of trade dress), passing off, or false designation of origin, but a common element that must be proved by the plaintiff is non-functionality; "trademark law is concerned only with identification of the maker, sponsor, or endorser of the product" and it "does not prevent a person from copying so called 'functional' features of a product."  _Id._ at 917.  Thus, Great Neck's alternative theories of recovery do not survive the Court's ruling as to the functionality of Great Neck's alleged trade dress.

that Great Neck's trade dress does not have the requisite distinctiveness and that Great Neck has not made a sufficient showing of likely customer confusion.

### III.  Conclusion

For the foregoing reasons:

(1)      Star Asia's motions to strike or exclude excerpts of Great Neck's expert's reports, docket nos. 123, 124, 125, are DENIED;

(2)      Star Asia's motion for partial summary judgment as to infringement of the utility patent, docket no. 114, is GRANTED;

(3)      Star Asia's motion for partial summary judgment as to infringement of the designs patents, docket no. 112, is GRANTED;

(4)      Star Asia's motion for partial summary judgment as to the trade dress and related claims, docket nos. 113 & 115, is GRANTED on three alternative grounds, namely functionality of the alleged trade dress, lack of distinctiveness, and insufficient evidence of likely consumer confusion;

(5)      Great Neck's Fourth Amended Complaint, docket no. 60, and the sixteen causes of action alleged therein are DISMISSED with prejudice; and

(6)      The Clerk is directed to enter judgment consistent with this Order in favor of Star Asia, to close this case, and to send a copy of this Order to all counsel of record.

///

///

IT IS SO ORDERED.

DATED this 23rd day of July, 2010.

Thomas S. Zilly
United States District Judge

ORDER - 46